## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ ) | | |
| PENSION BENEFIT GUARANTY ) | | |
| CORPORATION, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Civil Action No. 10-1936 (ABJ) | |
| ) | | |
| ASAHI TEC CORPORATION, ) | | |
| ) | | |
| Defendant. ) | | |
| _____) | | |

### MEMORANDUM OPINION

Plaintiff Pension Benefit Guaranty Corporation ("PBGC") brings this action against defendant Asahi Tec Corporation ("Asahi Tec") under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), *as amended* 29 U.S.C. §§ 1301–1461 (2006 and Supp. II 2008).   In 2007, defendant, a Japanese corporation, acquired a U.S.-based company, Metaldyne Corporation ("Metaldyne").  The complaint alleges that as a result of the acquisition, defendant became a "controlled group" member of Metaldyne and is therefore liable for the termination of Metaldyne's Pension Plan ("the Pension Plan") and for termination premiums. Defendant moved to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction [Dkt. # 11], arguing that the Court cannot exercise general or specific jurisdiction over the foreign corporation for the acts of its U.S. subsidiary.  The Court finds that plaintiff has made a prima facie showing that defendant purposefully directed activity towards the United States in connection with the acquisition of Metaldyne and the attendant assumption of controlled group pension liability, and that the claims in the complaint arise directly out of that specific conduct.

Therefore, the Court can exercise specific jurisdiction over the defendant, it will deny defendant's motion to dismiss, and it need not reach the question of general jurisdiction.

## I.     BACKGROUND

### A.  Factual Background

#### 1.   The Metaldyne Acquisition

Defendant Asahi Tec is a corporation organized under the laws of Japan that maintains its headquarters in Shizuoka, Japan.  Compl. ¶ 5.  Asahi Tec manufactures high quality cast iron and aluminum parts for trucks and cars.  Def.'s Mem. in Support of Mot. to Dismiss ("Def.'s Mem.") at 3.  In September 2006, defendant announced its plans to acquire Metaldyne, an automotive parts manufacturer based in Michigan that produced chassis and powertrain components and sub-assemblies for passenger cars and light trucks.  Compl. ¶ 10; Amato Decl. ¶ 11.  For purposes of the transaction, defendant established a wholly owned subsidiary in the United States and agreed to pay Metaldyne shareholders over $200 million for their interest in Metaldyne stock.  Compl. ¶ 10.  Asahi Tec approximated that the total consideration for the acquisition, including the refinancing of Metaldyne's debt, was $1.2 billion.  *Id*.

The complaint alleges that prior to the acquisition, "Asahi Tec performed due diligence in connection with this $1.2 billion transaction to assess the financial impact of the Metaldyne acquisition" and that "one aspect of that due diligence involved Asahi Tech's obligation for pension liabilities of Metaldyne."  *Id.* ¶ 11.  In particular, the complaint alleges that "Asahi Tec learned about the Pension Plan, that the Pension Plan had unfunded benefit and other pension-related liabilities and that, as a member of Metaldyne's controlled group, it would be jointly and severally liable with Metaldyne and other affiliates, for the Pension Liability under the Pension Plan."  *Id*.

The acquisition of Metaldyne was completed in January 2007. *Id.* ¶ 13. The complaint alleges, and defendant disputes, that following the merger, Asahi Tec "controlled and directed Metaldyne's operations and made Metaldyne its agent and alter ego to do business in the U.S." *Id.* Plaintiff further alleges the acquisition allowed Asahi Tec to "pursue[] its goals of gaining access to Metaldyne's engineering, design and manufacturing capabilities and expanding its global reach with Metaldyne's significant operations, presence, and customer base in the U.S. and elsewhere." *Id.* Plaintiff avers that Asahi Tec solicited customers and otherwise conducted "continuous and systematic business activities in the U.S. using Metaldyne as its agent and alter ego." *Id.*

### 2. Termination of Metaldyne's Pension Plan

On May 27, 2009, Metaldyne filed a voluntary petition for relief as debtors-in-possession under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. *Id.* ¶ 15. On July 13, 2009, plaintiff PGBC[1] filed a complaint under 29 U.S.C. § 1342 against Metaldyne in the U.S. District Court for the Eastern District of Michigan, seeking a decree terminating the Pension Plan and requesting that plaintiff be appointed as statutory trustee of the plan. *Id.* ¶ 16. Plaintiff alleges that prior to filing that action, it discussed defendant's controlled group liability with defendant's counsel in the United States and requested that Asahi Tec "assume sponsorship of the Pension Plan, given the fact that no buyer of Metaldyne's assets was expected to assume the Pension Plan in the Bankruptcy Cases." *Id.* Plaintiff avers that because Asahi Tec refused to assume sponsorship, the Pension

---

1    Plaintiff PBGC is a federal agency that administers the nation's pension plan termination insurance program established by Title IV of ERISA. According to plaintiff, "when a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes statutory trustee of the terminated plan and pays participants their guaranteed benefits, up to the statutory limits." Pl.'s Opp. to Mot. to Dismiss ("Pl.'s Opp.") at 4, citing 29 U.S.C. §§ 1321, 1322, 1361.

Plan was terminated effective July 31, 2009, and plaintiff became the statutory trustee pursuant to section 4042(c) of ERISA. *Id*. ¶ 17.   On September 18, 2009, plaintiff sent a demand letter to Asahi Tec informing the company that it was liable for the terminated pension because it was a controlled group member of Metaldyne. *Id*. ¶ 18.

### B.  Procedural Background

Plaintiff filed this action on November 12, 2010.  [Dkt. # 1].  The complaint alleges three claims under ERISA.  Count I seeks entry of judgment against Asahi Tec for the full principal amount of the pension liability plus accrued interest from July 31, 2009, to date of payment under 29 U.S.C. §§ 1303(e)(1), 1362(b), and 29 C.F.R. § 4062.7.  Compl. at 6–7.  Count II alleges that Asahi Tec is jointly and severally liable for termination premiums under 29 U.S.C. §§ 1306(a)(7) and 1307(e)(2).  *Id*. at 7–8.  Count III seeks litigation costs from this action under 29 U.S.C.§ 1303(e)(5).  *Id*. at 8.

On April 8, 2011, defendant filed a motion to dismiss for lack of personal jurisdiction [Dkt. # 11] under Fed. R. Civ. P. 12(b)(2).  Plaintiff opposed the motion, and in the alternative, requested that it be permitted to take jurisdictional discovery.  [Dkt. # 15].  On July 5, 2011, the Court permitted both parties to submit supplemental briefs addressing the Supreme Court's holdings in *Goodyear Dunlop Tires Operation, S.A., v. Brown*, 564 U.S. ---, 131 S. Ct. 2846 (2011), and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ---, 131 S. Ct. 2780 (2011). Minute Order, July 5, 2011.

A status conference was held on July 21, 2011, during which the Court ruled that no merits discovery could be conducted until after the Court ruled on the motion to dismiss, but it heard argument on the need for, and the potential scope of, jurisdictional discovery.  [Dkt. # 29]. The Court directed plaintiff to submit a proposal outlining the narrowly tailored documentary

discovery it was seeking and accorded defendant an opportunity to respond to the proposal. After consideration of the parties' submissions, the Court permitted plaintiff to take some limited discovery but narrowed the proposed order because it was broader than necessary to accomplish its asserted purpose. *Id*. After the completion of this discovery, the Court also allowed the parties to submit a supplemental brief addressing any evidence that was uncovered during the jurisdictional discovery process. Minute Order, Nov. 18, 2011. A hearing on the motion to dismiss was held on January 18, 2012.

## II.    STANDARD OF REVIEW

It is the plaintiff who bears the burden of establishing personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). In order to survive a motion to dismiss for lack of personal jurisdiction, the "plaintiff must make a prima facie showing of the pertinent jurisdictional facts." *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). To establish that personal jurisdiction exists, the plaintiff must allege specific acts connecting the defendant with the forum. *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 97–98 (D.D.C. 2008), citing *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). Plaintiff "cannot rely on conclusory allegations" to establish personal jurisdiction. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).

"A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction[.]" *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). However, "the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather, [plaintiff] may rest [its] arguments on the pleadings, 'bolstered by such affidavits and other written materials as [it] can otherwise

obtain.'"  *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010), quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (alteration in original).  Any factual discrepancies should be resolved in favor of the plaintiff.  *Crane*, 894 F.2d at 455–56.  But, the Court need not treat all of the plaintiff's jurisdictional allegations as true.  *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).   "Instead, the court may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."  *In re Papst Licensing*, 590 F. Supp. 2d at 98 (internal quotation marks and citation omitted).

## III. ANALYSIS

### A.  Legal Framework

The issue presented by this motion is whether this Court's exercise of jurisdiction over a foreign defendant such as Asahi Tec "is consistent with the Constitution (and laws) of the United States" as required by Fed. R. Civ. P. 4(k)(2).  *Mwani*, 417 F.3d at 10.  As the D.C. Circuit has explained, "[w]hether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process."  *Id.*, citing Fed. R. Civ. P. 4(k)(2).

Courts may exercise two forms of personal jurisdiction: "general or all-purpose jurisdiction, and specific or case-linked jurisdiction."  *Goodyear*, 131 S. Ct. at 2851.  A court has general jurisdiction where a nonresident defendant maintains sufficiently systematic and continuous contacts with the forum, regardless of whether those contacts gave rise to the claim in the particular case.  *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & n.9 (1984). [2]

---

2        "[B]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test than for specific jurisdiction."  *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 510 n.2 (D.C. Cir. 2002) (internal quotation marks

Specific jurisdiction exists where a claim arises out of the nonresident defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414 n.8. In order to comport with due process, a defendant must have "certain minimum contacts with [the forum] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Those guarantees are satisfied "if the defendant has purposefully directed his activities at residents of the forum, and the ligation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1984) (internal quotation marks and citation omitted).[3]

---

omitted). Thus, "[u]nder the Due Process Clause, such general jurisdiction over a foreign corporation is only permissible if the defendant's business contacts with the forum are continuous and systematic." *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1091–92 (D.C. Cir. 2008) (internal quotation marks omitted). Under some circumstances, the acts of a local subsidiary can be attributed to the foreign parent for jurisdictional purposes. *See Material Supply Int'l, Inc. v. Sunmatch Indus. Co.* 62 F. Supp. 2d 13, 20 (D.D.C. 1999) (stating that the alter ego test analyzes "(1) whether there is such a unity of interest and ownership that the separate personalities of [the companies] no longer exist; and (2) whether an inequitable result will follow if the court treats [the subsidiary's] allegedly wrongful acts as those of [the subsidiary] alone.") (internal citation and quotation marks omitted). But plaintiff conceded at oral argument that the record was not sufficiently well-developed to establish that the alter ego test for general jurisdiction had been met. Tr. at 16. In any event, since the Court will exercise specific jurisdiction in this case, it need not address whether the defendant's contacts with the United States were sufficient to give rise to general jurisdiction.

3      Defendant emphasized at oral argument that plaintiff cannot show that they were injured because of an activity that defendant directed at the forum. Tr. at 58 ("There are three elements, we believe, for specific jurisdiction. First, purposeful direction of activities toward the forum. Litigation resulting from alleged injuries that arise out of or relate to those activities . . . . Activities that give rise to injuries, that give rise to litigation.") Defendant claims that the injuries plaintiff has alleged relate to the underfunded Pension Plan and that because defendant had no involvement with the funding decisions for the Plan, there is no specific jurisdiction in this case. But plaintiff's claim is premised on the notion that liability flows directly from the ERISA statute, and it is not necessary to show that there is an injury to analyze the potential liability. 29 U.S.C. § 1362. Rather, the statute dictates that potential liability for plaintiff's claim began on the day that defendant acquired Metaldyne and subjected itself to control group

**B. Defendant's Status as a Controlled Group Member of Metaldyne Gives Rise to Specific Jurisdiction for Plaintiff's Claims under ERISA.**

The Court will first address plaintiff's contention that specific jurisdiction exists. Plaintiff asserts that the defendant purposefully directed activities towards the forum, and that the litigation seeks to redress injuries arising out of those activities. Defendant argues that the complaint alleges injuries related to the underfunded Pension Plan and the termination of the Plan, and that because defendant had no involvement with the funding decisions for the Plan or the termination, there is no basis for specific jurisdiction in this case.

There is no question that the foreign company not only acquired a U.S. subsidiary but that it did so with its eyes wide open. The complaint alleges and the jurisdictional discovery revealed that defendant undertook the acquisition after probing and then being specifically informed about the possibility of controlled group liability. Compl. ¶ 11 (alleging that prior to the acquisition, "Asahi Tec learned about the Pension Plan, that the Pension Plan had unfunded benefit and other pension-related liabilities and that, as a member of Metaldyne's controlled group, it would be jointly and severally liable with Metaldyne and other affiliates, for the Pension Liability under the Pension Plan."). The documents produced in discovery confirm that defendant hired Mercer Human Resource Consulting to conduct due diligence about the nature and scope of Metaldyne's employee benefit and compensation program. Ex. 60 to Lubell Supp. Decl. Mercer agreed to provide "analysis of long-term benefit plan liabilities of the company, and development of possible strategies to mitigate the obligations assumed by the buyer." *Id*. Moreover, the documents show that based on the results of the due diligence, defendant specifically incorporated the fact that it was assuming controlled group status – and thus could

---

liability, regardless of whether defendant was involved in the decision to terminate the Pension Plan.

ultimately be held liable for an underfunded plan – into the negotiated purchase price.  Ex. 61 to Lubell Supp. Decl. at 4–5.  So, defendant's purposeful contacts with the forum include not only the acquisition but the knowing assumption of the risk of future controlled group liability.

Since defendant did direct some activities at the United States, the question the Court must then resolve is whether plaintiff's ERISA claims arise out of Metaldyne's own actions after the merger or whether they arise out of the particular activities the foreign company directed at the forum, that is, its acquisition of Metaldyne and its purposeful assumption of controlled group status.  In other words, did the *termination* of the Pension Plan give rise to the claims, as defendant contends, or did Asahi Tec's *status* as a controlled group member of Metaldyne bring about the claims, as plaintiff contends?

Defendant argues that the Court lacks specific jurisdiction because it had no involvement in the termination of Metaldyne's Pension Plan.  According to defendant, there is no connection between any activity undertaken by defendant and plaintiff's claims.  Def.'s Mem. at 35. Defendant notes that, according to the complaint, "[t]he only entities that dealt with the [Pension] Plan were PGBC and Metaldyne," *id*. at 36, citing Compl. ¶¶ 16, 17, 25, and that plaintiff "does not allege that Asahi Tec engaged in any wrongdoing at all before PBGC chose to terminate the Plan," *id*. at 37.  Because defendant "did not commit any wrongful or tortious acts in the United States at all – let alone any relating to the operation of Metaldyne's pension plan itself – [plaintiff] cannot show that this litigation results from alleged injuries that 'arise out of or relate to . . . activities' that Asahi Tec 'purposefully directed' toward the United States[.]"  *Id*., citing *Burger King*, 471 U.S. at 473.

Plaintiff does not dispute that defendant played no role in the termination decision but it contends that circumstance is irrelevant because the claim does not seek to impose liability for

the act of termination, or for something wrongful about the termination, or even the act of

funding the Pension Plan.  *See* Pl.'s Opp. at 38–39; Tr. at 20–21.  Rather, this action seeks to

enforce the *controlled group* members' obligations, which attached at the time of purchase.

The answer must be sought in the complaint, and a review of its allegations leads to the

conclusion that it was defendant's *status* as a controlled group member, and not the act of

termination, that is the driving force behind this lawsuit.  The Court notes the following sections

of the complaint:

- Paragraph seven alleges that under sections 1362(a) and (b) of ERISA, each member of the controlled group incurs joint and several liability for underfunded pension liabilities.  Compl. ¶ 7.  Similarly, paragraph nine of the complaint alleges that under section 1306 and 1307(e) of ERISA, if an underfunded pension plan terminates under 29 U.S.C. § 1342, "the contributing sponsor of the plan and each member of the contributing sponsor's controlled group is liable for a termination premium[.]"  Compl. ¶ 9.  Under both of these statutory provisions invoked in the complaint, liability does not turn on anything the controlled group did to bring about termination – it simply flows from the fact of the termination and status as a controlled group member.

- Paragraph eleven alleges that defendant conducted due diligence prior to the acquisition and, as a result, "learned that the Pension Plan had unfunded benefit and other pension-related liabilities and that, as a member of Metaldyne's controlled group, it would be jointly and severally liable with Metaldyne and other affiliates, for the Pension liability under the Pension Plan."  Compl. ¶ 11.

- Paragraphs seventeen and eighteen set forth that plaintiff and Metaldyne entered into an agreement that terminated the plan and that the complaint in Michigan was dismissed.  At that point, plaintiff informed defendant through a demand letter that "PBGC's contingent liability for unfunded benefits has matured" and that "Asahi Tec, as a controlled group member, is liable for the Pension liability[.]"  *Id.* ¶ 18.

- Indeed, paragraphs fifteen through eighteen fall under the heading that states: "Asahi Tec's joint and several pension liability *matured* upon termination of the pension plan."  Compl. at 14 (emphasis added).  In other words, defendant did not have to take any action once termination occurred for potential liability to exist.[4]

---

4    The Court also notes that paragraph sixteen states that it was *plaintiff* that filed a complaint in federal court in Michigan seeking a decree to terminate the plan.  In other words, if the court had issued the requested decree in that action, it would not have been Metaldyne or

Taken together, these allegations directly link the claims at issue in this lawsuit with the defendant's conduct in the United States – its knowing undertaking of the obligations arising out of its status as a controlled group member of Metaldyne.  This status pre-existed the termination of the Pension Plan, so it is immaterial whether defendant had any involvement in the termination of the plan.[5]

Defendant's primary argument against the existence of specific jurisdiction is that it would "allow Congress to legislate personal jurisdiction over foreign corporations simply by legislating parent corporation *liability*."  Def.'s Supp. Mem. at 13–14.  Defendant contends that "[s]imply acquiring a subsidiary does not expose the parent to personal jurisdiction for claims based on the subsidiary's liabilities."  Def.'s Reply in Supp. of Mot. to Dismiss at 18, citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  While that may be true as a general principle

---

Asahi Tec that was the entity responsible for the termination.  Compl. ¶ 16.  Furthermore, the complaint alleges that plaintiff approached Asahi Tec's counsel prior to the termination of the plan and requested that Asahi assume sponsorship of the plan because of its controlled group liability.  *Id.*  Thus, if, as defendant argues, the question of which party is responsible in the termination is relevant, the complaint does ascribe a role – albeit a negative one for a failure to stop the termination – to Asahi Tec.

5       The conclusion that plaintiff's ERISA claims arise out of the Metaldyne acquisition and not the termination of the Plan in particular is bolstered by the plain language of the ERISA statute.  Count I of the complaint seeks relief under sections 1362(a) and (b), which "impose Pension Liability upon the contributing sponsor of a pension plan covered by Title IV of ERISA and the members of the controlled group, jointly and severally, if, upon termination of the pension plan, the plan assets are insufficient[.]"  Compl. ¶ 21, citing 29 U.S.C. § 1362(a), (b). So, the liability that forms the basis for the claim, which was contingent upon a termination, was what defendant knowingly undertook at the moment it acquired Metaldyne.  It was not necessary for defendant to direct any further action at the forum to trigger the potential pension liability. Likewise, Count II of the complaint alleges a claim for termination penalties under sections 1306(a)(7) and (e)(2), but even this claim is premised on the notion that the penalties became due at the time of termination.  There is no allegation in the complaint that Asahi Tec is liable due to some wrongfulness of the decision to terminate, so defendant's argument that it did not participate in the termination decision is misplaced.

of corporate law, the claim asserted by plaintiff is a unique cause of action, which predicates liability solely on an entity's status as a controlled group of a company with a qualifying pension plan; neither this action nor the applicable ERISA provisions impose vicarious liability on the parent for the independent actions of a subsidiary. And in this case, that particular liability was a known risk expressly factored into the transaction that defendant voluntarily crossed the Pacific to undertake. So, the cases defendant relies upon prohibiting courts from imputing liability to parents generally are not persuasive because they did not directly address the same type of claim and the factual showing at issue in this case. [6]

Moreover, the exercise of jurisdiction does not conflate jurisdiction with liability as defendant maintains. The Court's conclusion that specific jurisdiction exists for the limited purpose of hearing these ERISA claims does not necessarily mean that defendant will ultimately be responsible for the pension liability. Rather, specific jurisdiction is proper because defendant is *potentially* liable for the pension by virtue of the acquisition. In other words, defendant's actions in acquiring Metaldyne and its pension obligations are enough to put defendant in the position of being subjected to litigation *on that issue*. [7]

---

[6]    Both parties point to the Supreme Court's recent decisions in *Goodyear* and *McIntyre* as supporting their respective positions on personal jurisdiction. Def.'s Notice of Supp. Authority [Dkt. # 21]; Pl.'s Supp. Mem. Addressing the Supreme Court's Holdings [Dkt. #22]. In both of those cases, the Supreme Court addressed the "stream of commerce" analysis of general jurisdiction. Because the Court does not reach the question of whether general jurisdiction exists over Asahi Tec, these decisions do not bear on the issues presented in this case.

[7]    An exchange between the Court and defendant's counsel at the motions hearing underscores this point:

THE COURT: But under this statute does [it] matter if you were an owner?

[DEFENDANT'S COUNSEL]: I think if you assume that you have a control group member, for liability, no it doesn't matter, because the statute creates liability for a control group member.

Defendant relies on two cases from the Seventh Circuit for the proposition that merely being the parent and therefore subject to liability under ERISA does not necessarily confer jurisdiction.  Def.'s Supp. Mem. at 14, citing *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934 (7th Cir. 2000); *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018 (7th Cir. 2009).  Defendant contends that these cases demonstrate that "ERISA cannot trump the Constitution" because "'[j]urisdiction and liability are two different inquiries,' and a plaintiff may not rely on a federal statute, such as ERISA, to 'transmogrify insufficient minimum contacts into a basis for personal jurisdiction by making these contacts elements of a cause of action.'"  Def.'s Mem. at 38, quoting *Reimer*, 230 F.3d at 944, and citing *Goldfarb*, 565 F.3d at 1023–24.  But those decisions are not controlling authority here, and the circumstances that gave rise to those opinions are distinguishable from the facts presented in this case.

In *Reimer*, the court affirmed the district court's determination that "corporate ownership generally is not a sufficient basis for personal jurisdiction."  230 F.3d at 939.  The Seventh Circuit reasoned in part that when a parent and subsidiary are two separate entities, the acts of the subsidiary cannot be imputed to the parent merely based on the subsidiary's presence in the forum.  *Id.* at 944.  Here, plaintiff is not seeking to impute presence in the forum to defendant merely because of Metaldyne's existence in the United States, and it is not basing jurisdiction on the subsidiary's acts.  Rather, for purposes of plaintiff's specific claims under ERISA, a statute which predicates liability on the fact of ownership alone, the deliberate and knowing decision to

---

THE COURT:  Why isn't that the beginning and the end of it? That's [plaintiff's] argument.

Tr. at 62–63.

acquire a company in the United States and subject itself to that regulatory scheme is a sufficient minimum contact to confer jurisdiction for the limited purpose of an action to enforce that liability.  In the Court's view, that conclusion comports with the notions of the due process and fair play values that underlie personal jurisdiction analysis, while also giving proper consideration to the forum's interest in adjudicating the dispute.

This case is also distinguishable from *Reimer* because it does not present a corporate ownership "without more" situation.  *Reimer*, 230 F.3d at 943 ("We join other courts in finding that stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact.").  The Seventh Circuit found that the parent corporation could not have reasonably expected to be held liable for the activities of the subsidiary, *id.* at 944, whereas here, Asahi Tec actually conducted due diligence on the potential liability and knowingly entered into the transaction, building the risk into the price it paid for the Metaldyne acquisition.[8]

Similarly, the question that the Seventh Circuit addressed in *Goldfarb* is not the same as the one presented to this Court.  *Goldfarb* concerned withdrawal liability under ERISA, not termination liability.  565 F.3d at 1022.  One of the elements of a claim for withdrawal liability is that the employer "withdrew," so the court engaged in a detailed analysis of whether the defendant's alleged actions in the forum were related to the withdrawal.  *See* 29 U.S.C. § 1381(a) (providing that "if an employer withdraws . . . the employer is liable").  Section 1362, the source of plaintiff's claim in this case, simply states:  if a plan is terminated under section 1341 or the

---

8       Plaintiff also distinguishes *Reimer* by noting that the connection between the foreign parent and the U.S. subsidiary was much more attenuated than the relationship between Asahi Tec and Metaldyne.  Tr. at 36–37.  In *Reimer*, the Canadian parent purchased another Canadian corporation that owned a different Canadian company, which operated in part in the United States.  230 F.3d at 937.  As the Seventh Circuit observed, the parent company was the "great-grandparent" of the business entity in the United States.  *Id*.  The connection between Metaldyne and Asahi Tec was much more direct.

corporation terminates it under section 1342, then the corporation and the control group incur joint and several liability.  Thus, unlike the cause of action in *Goldfarb* where liability had to have been triggered by some act of the defendant, liability in this case is controlled by mere ownership at the time of termination.[9]   Moreover, in *Goldfarb*, the court said that an action against a foreign defendant must "*directly* arise out of the specific contacts between the defendant and the forum state."  565 F.3d at 1024 (emphasis added) (internal quotation omitted); *cf. Burger King*, 471 U.S. at 472 (stating that the action must "arise out of or relate to").  Thus, the Seventh Circuit imposed a more stringent test than the one required by the Supreme Court, and this Court declines to adopt that test here.

Plaintiff argues that *Goldfarb* is wrong as a matter of law under the Supreme Court's decision in *Int'l Shoe Co.*, 326 U.S. at 319.  Tr. at 31.  At oral argument, plaintiff highlighted the following language from the decision:

> [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws for that state.  The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Id.*, quoting *Int'l Shoe*, 326 U.S. at 319 (internal citations omitted).  But that language, while it supports plaintiff's argument, was simply dicta because the Court's decision ultimately rested on the fact that defendant carried on systematic and continuous activities in the state such that jurisdiction was proper.  *Id*. at 320; *see also Goodyear*, 131 S. Ct. 2846, 2853 (2011) (finding

---

9       The same conclusion applies to another case upon which defendant relies, *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586 (9th Cir. 1996).  In *AT&T*, plaintiff brought a cause of action under the Comprehensive Environmental Response, Compensation and Liability Act, which, as plaintiff points out, requires a showing that the parent company is responsible for the misconduct that gave rise to the claim.  *Id*. at 588; Tr. at 39.  Here, liability for plaintiff's claim is entirely statutory and does not depend on the same type of showing.

that jurisdiction exists where, "as in International Shoe itself, jurisdiction unquestionably could be asserted where the corporation's in-state activity is 'continuous and systematic' and *that activity gave rise to the episode-in-suit*") (emphasis in original).[10]

Defendant warns that a finding of specific jurisdiction on these facts would be a "revolutionary concept," Tr. at 61, that would "ignore[] the constitutional dimensions of personal jurisdiction." Def.'s Supp. Mem. at 14. But the conclusion that defendant is subject to specific jurisdiction to answer these limited claims fully comports with the values of fairness and due process. *See Burger King*, 471 U.S. at 477 ("These [fair play and substantial justice] considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."). First of all, as the Court noted above, the defendant was well aware of the potential liability that attached to its purchase of Metaldyne, and it factored that into its economic calculus. Second, it is notable that defendant previously freely admitted to jurisdiction in another lawsuit in the United States. *See* Answer, *HLI Creditors Trust v. Asahi Tec Corp.*, No. 03-56960 (Bankr. D. Del. Jan. 9, 2004) ("Defendant admits that it is a corporation incorporated in Japan that is doing business in the United States.") The fact that defendant has already submitted to jurisdiction in the United States in another action – indeed, general jurisdiction – makes its claim that litigating this action would be "unjust and unreasonable," Def.'s Mem. at 40–42; Def.'s Reply at 21, less than compelling.

Furthermore, the facts adduced by plaintiff to support a finding of general jurisdiction show that, in addition to the acquisition, defendant has had other contacts with the forum.

---

10    Defendant also contends that the choice of law and forum selection clauses in the Metaldyne acquisition documents are irrelevant to the specific jurisdiction analysis. Def.'s Mem. at 39–40. The Court does not base its conclusion that specific jurisdiction on these grounds but notes that they weigh in favor of finding that the exercise of jurisdiction on the facts presented does not offend due process.

Defendant continued to solicit business from automakers in the United States even after the demise of Metaldyne, in one instance by hiring a Michigan-based sales agent in the United States.  Pl.'s Supp. Mem. at 5–10 [Dkt. # 39]; Ex. 1 to Lubell Supp. Decl. [Dkt. #35].  The facts also show that Metaldyne was not simply a passive investment for defendant, but that there were at least some integration activities and shared management between the companies and that defendant viewed Metaldyne – and publicly touted the merger – as an opportunity to expand its global footprint.  *See, e.g.*, Ex. 37 to Lubell Supp. Decl. [Dkt. #35] at 6 (presentation to investors referring to the merged companies as "The New Asahi Tech"); Ex. 35 to *id.* at 7 (presentation to the shareholders that one of the merits of the Metaldyne acquisition was "access to global markets").  In a press release announcing the acquisition, defendant proclaimed that "Metaldyne and Asahi Tec came together to create a new, better capitalized global company that delivers leading edge products and processes to our customers . . . . These actions . . . will allow us to take advantage of the opportunities offered in this highly competitive global market."  Ex. 35 to Barone Decl. at 1–2.  These facts, while they may or may not be sufficient to warrant a finding of general jurisdiction for all purposes, support the conclusion that exercising jurisdiction in this case would not offend "traditional notions of fair play and substantial justice."  *Asahi Metal Indus. Co. v. Superior Court of Cal*., 480 U.S. 102, 113 (1987) (internal quotation marks omitted).

In sum, this case presents a unique question of jurisdiction that has not been addressed by either the Supreme Court or the D.C. Circuit.  The cause of action here is based on mere ownership of the company at the time of termination – not on any wrongful conduct on the defendant's behalf – and the alleged liability is a direct, joint and several liability that is imposed under ERISA and that comes about as a consequence of owning a U.S. company that has a tax

qualified Pension Plan.  *See* Tr. at 32.  Since the defendant's purposeful contacts with the forum include becoming an owner and assuming that liability, and the litigation arises directly out of those specific contacts, the Court finds that plaintiff has made a prima facie showing of specific jurisdiction.

## IV. CONCLUSION

The Court will deny defendant's motion to dismiss for lack of personal jurisdiction because it concludes that plaintiff has made a prima facie showing of specific jurisdiction.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 14, 2012