```
_____
                                        )
PENSION BENEFIT GUARANTY                )
CORPORATION,                            )
                                        )
                  Plaintiff,            )
                                        )
       v.                               )        Civil Action No. 10-1936 (ABJ)
                                        )
ASAHI TEC CORPORATION,                  )
                                        )
                  Defendant.            )
_____)
```

### MEMORANDUM OPINION

Plaintiff Pension Benefit Guaranty Corporation ("PBGC") has brought this action against defendant Asahi Tec Corporation ("Asahi Tec") under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), *as amended* 29 U.S.C. §§ 1301–1461 (2006 and Supp. II 2008). Compl. [Dkt. # 1] ¶ 1. In 2007, defendant, a Japanese corporation, acquired a U.S.-based company, Metaldyne Corporation ("Metaldyne"). *Id.* ¶ 13. Plaintiff alleges that as a result of the acquisition, defendant became a "controlled group" member of Metaldyne and is therefore liable for the unfunded benefit liabilities and termination premiums that arose from the termination of Metaldyne's Pension Plan ("the Pension Plan"). *Id.* ¶ 1.

On April 8, 2011, defendant moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Def.'s Mot. to Dismiss [Dkt. # 11] at 1. On March 14, 2012, the Court denied defendant's motion on the grounds that plaintiff had made a prima facie showing that the Court had specific jurisdiction over defendant. *Pension Benefit Guar. Corp. v. Asahi Tec Corp.*, 839 F. Supp. 2d 118, 120 (D.D.C. 2012).

After the Court's March 2012 ruling, defendant answered the complaint asserting lack of personal jurisdiction as one of its affirmative defenses. Def.'s Answer and Affirmative Defenses ("Answer") [Dkt. # 51] ¶ 30. Subsequently, plaintiff moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on two issues: (1) defendant's affirmative defense of lack of personal jurisdiction; and (2) defendant's liability for unfunded benefit liabilities under 29 U.S.C. § 1362 and for termination premiums under 29 U.S.C. §§ 1306(a)(7) and 1307(e)(2). Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot.") [Dkt. # 58] at 1; Compl. ¶ 26. The motion leaves the question of damages for another day. For the reasons stated below, the Court will grant plaintiff's motion.

## BACKGROUND

### I.  Factual Background

#### A.  The Metaldyne Acquisition

Defendant Asahi Tec is an automotive parts manufacturer organized under the laws of Japan that maintains its headquarters in Shizuoka, Japan. Decl. of Kenichi Ando ("Ando Decl.") [Dkt. # 11-9] ¶ 8. In September of 2006, defendant announced its plans to acquire Metaldyne, an automotive parts manufacturer based in Michigan. *Id.* ¶ 27. Metaldyne was the contributing sponsor of a single-employer pension plan covered under Title IV of ERISA ("Pension Plan"). Compl. ¶ 20. Prior to the acquisition, defendant conducted due diligence on Metaldyne and engaged New York-based Mercer Human Resource Consulting ("Mercer") for the purpose of reviewing Metaldyne's employee benefit and compensation programs. Mar. 3, 2006 Letter from Edgar Friedman of Mercer to Takao Yoshida of Asahi Tec, Ex. 60 to Lubell Supp. Decl. ("Mercer Letter") [Dkt. # 35-85]. Defendant asked Mercer, among other things: (1) to "collect and review benefit plan information available on . . . [Metaldyne] sponsored qualified and non-

qualified defined benefit pension plans"; (2) to analyze "long-term benefit plan liabilities of [Metaldyne]"; and (3) to develop "possible strategies to mitigate the obligations assumed by the buyer." *Id.* at 1.

On March 20, 2006, Mercer presented the results of its due diligence on Metaldyne in a report to RHJ International (RHJI"), defendant's controlling shareholder.[1] Project Alloy, HR Due Diligence Report by Mercer ("Mercer Report") [Dkt. # 35-86]. The report explained that Mercer had "identified significant underfunded long term employee benefit obligations in" three areas including Metaldyne's Pension Plan for U.S. union and non-union employees. *Id.* at 2. Mercer added: "We understand that these amounts [of underfunding] will be reflected in the transaction's pricing." *Id.* at 3.

The report's statement about reflecting the underfunded pension obligations in the transaction's pricing appears to have been based on email exchanges between representatives from Mercer and RHJI in late February and early March of 2006. In those emails, Tetsuji Okamoto from RHJI discussed adjusting Metaldyne's equity value to account for the underfunded pension amounts with representatives from Mercer, Marsh & McLennan Companies (Mercer's parent), Nikko Citigroup, and Ernst & Young. *See* Feb. 25-27, 2006 Email Chain from Tetsuji Okamoto to Takao Yoshida, Ex. 8 to Ralph L. Landy Supplemental Decl. [Dkt. # 73-9] at 2; *see also* Mar. 1, 2006 Email, Ex. 2 to Pl.'s Reply [Dkt. # 74] at 1. Okamoto also informed Takao Yoshida, defendant's Chief Financial Officer,[2] about Metaldyne's underfunded Pension Plan and that the acquisition team was considering adjusting Metaldyne's

---

1    RHJI is also headquartered in Shizuoka, Japan. Schedule 14A & 14C Info. for Metaldyne Corp., Dec. 21, 2006, Ex. 3 to Daniel S. Lubell Decl. [Dkt. # 15-5] at 1.

2    *See* Hirohisa Yamada Decl. [Dkt. # 69-6] ¶ 4.

equity value to reflect the underfunding amount.  Feb. 25–27, 2006 Email from Tetsuji Okamoto to Takao Yoshida [Dkt. # 73-9] at 2.

In preparation for the acquisition, defendant formed Argon Acquisition Corporation ("Argon"), a wholly owned subsidiary incorporated in Delaware, which would be merged into Metaldyne.  Schedule 14A & 14C Info. for Metaldyne Corp., Dec. 21, 2006, Ex. 3 to Daniel S. Lubell Decl. [Dkt. # 15-5] at 11.  On August 31, 2006, defendant, Argon, and Metaldyne signed a merger agreement.  *Id.* at 21.  After obtaining the consent of Metaldyne's common shareholders with sufficient voting power to approve the merger, on November 27, 2006, defendant, Argon, and Metaldyne signed an amended merger agreement.  Amended and Restated Agreement and Plan of Merger, Nov. 27, 2006, Ex. 1 to Daniel S. Lubell Decl. ("Merger Agreement") [Dkt. # 15-3].  The acquisition of Metaldyne was completed in January of 2007. Cert. of Merger of Argon and Metaldyne, filed Jan. 11, 2007, Ex. 7(2) to Lubbell Decl. [Dkt. # 15-9].

B.  Termination of Metaldyne's Pension Plan

On May 27, 2009, Metaldyne filed a voluntary petition for relief as debtors-in-possession under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.  Anthony Barone Decl. ("Barone Decl.") [Dkt. # 11-15] ¶¶ 48– 49.  On July 1, 2009, plaintiff PBGC[3] spoke with defendant's counsel about defendant's potential liability for the Pension Plan based on its status as a member of Metaldyne's controlled

_____

3      Plaintiff PBGC is a federal agency that administers the nation's pension plan termination insurance program established by Title IV of ERISA.  According to plaintiff, "when a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes statutory trustee of the terminated plan and pays participants their guaranteed benefits, up to the statutory limits."  Pl.'s Opp. to Mot. to Dismiss [Dkt. # 15] at 4, citing 29 U.S.C. §§ 1321, 1322, 1361; *see also* Pl.'s Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mem.") [Dkt. # 58-1] at 3 ("PBGC has been appointed trustee of virtually every one of the more than 4,000 underfunded plans that have been terminated since 1974.").

group and "inquired as to whether Asahi Tec would assume sponsorship of the Plan," given the fact that no buyer of Metaldyne's assets was expected to assume the Pension Plan in the bankruptcy case. Letter from PBGC to Asahi Tec Corp., Ex. 1 to Ralph L. Landy Decl. [Dkt. # 58-3] at 1. Defendant refused to assume sponsorship of the Plan. Ralph L. Landy Decl. ("Landy Decl.") [Dkt. # 58-3] ¶ 4.

On July 13, 2009, plaintiff filed a complaint under 29 U.S.C. § 1342 against Metaldyne in the U.S. District Court for the Eastern District of Michigan, seeking a decree terminating the Pension Plan and requesting that plaintiff be appointed as statutory trustee of the plan. Answer [Dkt. # 51] ¶ 16; *see also* Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7]. The Pension Plan was terminated effective July 31, 2009, and plaintiff became the statutory trustee pursuant to 29 U.S.C. § 1342(c) of ERISA. Agreement for Appointment of Trustee and Termination of Plan ¶¶ 2–3. On September 18, 2009, plaintiff sent a letter to defendant informing the company that it was liable for the unfunded liabilities arising from the terminated Pension Plan because it was a controlled group member of Metaldyne. Letter from PBGC to Asahi Tec Corp., Ex. 1 to Landy Decl. [Dkt. # 58-3] at 1. Defendant refused to pay PBGC any amount in connection with the Pension Plan. Landy Decl. ¶ 6.

## II. Procedural Background

Plaintiff filed this action on November 12, 2010. Compl. at 9. The complaint alleges three claims under ERISA. Count I seeks entry of judgment against defendant for the full principal amount of the pension liability plus accrued interest from July 31, 2009 to the date of payment under 29 U.S.C. §§ 1303(e)(1), 1362(b), and 29 C.F.R. § 4062.7. *Id.* ¶¶ 19–23. Count II alleges that defendant is jointly and severally liable for termination premiums under 29 U.S.C.

§§ 1306(a)(7) and 1307(e)(2). *Id.* ¶¶ 24–26. Count III seeks litigation costs from this action under 29 U.S.C. § 1303(e)(5). *Id.* ¶¶ 27–28.

On April 8, 2011, defendant filed a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). Def.'s Mot. to Dismiss at 1. Plaintiff opposed the motion on the grounds that the allegations in the complaint and the evidence presented by defendant to support its motion to dismiss were sufficient to demonstrate personal jurisdiction over defendant. Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss [Dkt. # 15] at 2–4. Alternatively, plaintiff argued that if the Court could not determine, based on the record at the time, that it had personal jurisdiction, then plaintiff should be permitted to take jurisdictional discovery. *Id.* at 3–4. Defendant did not oppose plaintiff's request for jurisdictional discovery. *See* Def.'s Unopposed Mot. for Extension of Time to Respond to Pl.'s Compl. [Dkt. # 10] ¶ 6.

On August 15, 2011, the Court issued an order allowing plaintiff to take limited discovery on the jurisdictional issue. Mem. Op. and Order [Dkt. # 29] at 2–3. The Court then invited the parties to submit supplemental briefs addressing any evidence that was uncovered during the jurisdictional discovery process. Minute Order, Nov. 18, 2011. The Court also permitted both parties to submit additional briefs addressing the Supreme Court's holdings in *Goodyear Dunlop Tires Operation, S.A., v. Brown*, 564 U.S. ---, 131 S. Ct. 2846 (2011), and *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ---, 131 S. Ct. 2780 (2011). Minute Order, July 5, 2011. A hearing on the motion to dismiss was held on January 18, 2012.

On March 14, 2012, the Court denied defendant's motion. *Asahi Tec*, 839 F. Supp. 2d at 120. It found that there was specific jurisdiction over defendant because plaintiff had "made a prima facie showing that defendant purposefully directed activity towards the United States in connection with the acquisition of Metaldyne and the attendant assumption of controlled group

pension liability, and that the claims in the complaint arise directly out of that specific conduct." *Id.*[4]

On May 18, 2012, defendant answered the complaint, asserting lack of personal jurisdiction as one of its affirmative defenses. Answer ¶ 30. Subsequently, plaintiff moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on defendant's affirmative defense of lack of personal jurisdiction, and defendant's liability for unfunded benefit liabilities under 20 U.S.C. § 1362 and termination premiums under 29 U.S.C. §§ 1306 and 1307. Pl.'s Mot. at 1. Defendant opposed the motion. Mem. in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Opp.") [Dkt. # 69]. Plaintiff replied to defendant's opposition. Reply Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Reply") [Dkt. # 74]. A hearing was held in connection with some of the statutory issues involved on September 26, 2013.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) allows a party to move for summary judgment on a claim or defense or part of a claim or defense. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate

---

4    The Court granted defendant's motion to certify the personal jurisdiction question for interlocutory appeal, but the court of appeals sent it back. *See Per Curiam* Order, Ex. to Notice of Resolution of Asahi Tec's Pet. for Interlocutory Appeal [Dkt. # 52-1].

specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### I. Personal Jurisdiction

The parties and the Court have devoted considerable attention to the question of the availability of personal jurisdiction over Asahi Tec since the time the case was filed. Now, plaintiff has moved for partial summary judgment on defendant's affirmative defense of lack of personal jurisdiction. At this stage in the proceedings, while the law on personal jurisdiction has not changed, the Court must apply a different standard than the one that governed the motion to dismiss, and plaintiff has marshaled additional documentary evidence to support a finding of specific jurisdiction over defendant. Since defendant has failed to designate specific facts showing that there is a genuine dispute of material fact as to whether the Court has specific jurisdiction in this case, the Court will grant plaintiff's motion for summary judgment on defendant's affirmative defense of lack of personal jurisdiction.

A. Legal Standard

One of the issues presented by this motion is whether this Court's exercise of jurisdiction over a foreign defendant such as Asahi Tec "is consistent with the Constitution (and laws) of the United States" as required by Fed. R. Civ. P. 4(k)(2). *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). As the D.C. Circuit has explained, "[w]hether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process." *Id.* at 11, citing Fed. R. Civ. P. 4(k)(2).

Courts may exercise two forms of personal jurisdiction: "general or all-purpose jurisdiction, and specific or case-linked jurisdiction."[5] *Goodyear*, 131 S. Ct. at 2851. Specific jurisdiction exists where a claim arises out of the nonresident defendant's contacts with the forum. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984). In order to comport with due process, a defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Those guarantees are satisfied "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1984) (internal quotation marks and citation omitted).[6] In this case, defendant has failed to raise a genuine dispute of material fact as to whether either of these requirements is met, and the Court

---

5    Since the Court will exercise specific jurisdiction in this case, it need not address the parties' arguments with respect to whether defendant's contacts with the United States were sufficient to give rise to general jurisdiction. *See* Pl.'s Mem. at 20–22; Def.'s Opp. at 16–27; Pl.'s Reply at 11–15.

6    The Court addressed the personal jurisdiction cases in great detail in its prior opinion, and the discussion in that opinion also forms part of the basis for this decision. *See generally PBGC v. Asahi Tec Corp.*, 839 F. Supp. 2d 118 (D.D.C. 2012).

will therefore grant plaintiff's motion for summary judgment with respect to the personal jurisdiction issue.

B. <u>Defendant purposefully directed its activities at the United States.</u>

At the motion to dismiss stage, plaintiff proffered documentation showing that prior to the Metaldyne acquisition, defendant engaged Mercer to provide "analysis of long-term benefit plan liabilities of the company, and development of possible strategies to mitigate the obligations assumed by the buyer." Mercer Letter at 1. After conducting this analysis, Mercer informed defendant's parent company that it had "identified significant underfunded long term employee benefit obligations in" three areas including Metaldyne's defined benefit pension plan for U.S. union and non-union employees. Mercer Report at 2. Mercer also stated: "We understand that these amounts [of underfunding] will be reflected in the transaction's pricing." *Id.* at 3. The Court concluded that these documents demonstrated that defendant knew about and specifically incorporated the controlled group liability into the negotiated purchase price for Metaldyne. *Asahi Tec*, 839 F. Supp. 2d at 124. It then held that "defendant's purposeful contacts with the forum include[d] not only the [Metaldyne] acquisition but the knowing assumption of the risk of future controlled group liability." *Id.*

In its current opposition memorandum, defendant argues that plaintiff is not entitled to summary judgment on specific jurisdiction because it cannot demonstrate "that two facts central to the Court's [March 2012] decision are even true, let alone undisputed." Def.'s Opp. at 6. Specifically, defendant asserts that "discovery had confirmed that (a) Asahi Tec had no knowledge of the risk of future controlled group liability when it acquired Metaldyne and that (b) this risk was not factored into the acquisition price." *Id.* Defendant also contends that the Court cannot consider Mercer's statement about its belief that the underfunding amount would be reflected in the acquisition price for Metaldyne because it is hearsay and thus inadmissible.

Def.'s Opp. at 10, citing *Commercial Drapery Contrs. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).

But the Court has sufficient grounds to exercise personal jurisdiction even if Mercer's statement about Asahi Tec's intentions is put to one side. There is evidence that the defendant, during the course of its acquisition of a U.S. company, engaged another U.S. company, Mercer, for the specific purpose of looking into the pension plan obligations that would be assumed by Metaldyne's buyer. In the Court's view, the engagement letter alone could support the exercise of specific jurisdiction – it does not offend traditional notions of due process to bring the defendant into Court to answer a limited set of allegations arising directly out of the circumstances specifically considered at the time of the purchase of the U.S. company.

Moreover, there is additional evidence, putting aside the Mercer unattributed hearsay that reinforces the point. In a February 25, 2006 email, Tetsuji Okamoto from RHJI, Asahi Tec's parent company, informed Edgar Friedman from Mercer that RHJI and defendant were in the process of negotiating the valuation of Metaldyne. Feb. 25–27, 2006 Email Chain, Ex. 3 to Pl.'s Reply [Dkt. # 74] at 5. Okamoto explained that they were "considering adjusting Metaldyne's equity value for any underfunded pension amounts," and he asked for information regarding the underfunded pension amount as of December 2005. *Id.* Friedman provided the figures and informed Okamoto that he agreed with his "idea of stripping out the costs related to the underfunding." *Id.* at 1, 6. During the same period, Okamoto sent an email to Takao Yoshida, defendant's Chief Financial Officer at the time, stating: "We are considering adjusting Metaldyne's equity value for any underfunded pension amounts, but we need to check first about the status at Asahi Tec (if we have more underfunded pension than Metaldyne, we obviously

should not be including it as an adjustment item)." Feb. 25–27, 2006 Email Chain from Tetsuji Okamoto to Takao Yoshida [Dkt. # 73-9] at 2.

Shortly thereafter, Okamoto emailed a group of people – including Friedman and representatives from Marsh & McLennan Companies (Mercer's parent), Nikko Citigroup, and Ernst & Young – stating that RHJI and defendant were about to submit their preliminary view of the equity value split between defendant and Metaldyne. Mar. 1, 2006 Email, Ex. 2 to Pl.'s Reply [Dkt. # 74] at 1. Okamoto explained that to prepare this preliminary view, the team needed "to dive deep into the pension related adjustments due to its large adjustment potential." *Id.* These email exchanges demonstrate that defendant and its parent company knew about Metaldyne's underfunded Pension Plan and requested additional information about the level of underfunding so that they could factor it into the equity value of Metaldyne and, consequently, into the ultimate acquisition price.

More importantly, defendant did not just know about the underfunded Pension Plan, it also knew that the Pension Plan was governed by ERISA and that ERISA provided for controlled group liability. Specifically, the merger agreement between defendant, Argon, and Metaldyne recognized that Metaldyne had employee pension benefit plans that were governed by ERISA. Merger Agreement § 3.11(a). The agreement stated: "Except for liability that would not be reasonably likely to have a Company Material Adverse Effect, no liability under Title IV of ERISA or to the Pension Benefit Guaranty Corporation (other than PBGC insurance premiums) has been or is expected to be incurred by the Company or any Company Subsidiary or Commonly Controlled Entity with respect to any ongoing, frozen or terminated 'single-employer' plan (as defined in Section 4001(a)(15) of ERISA), currently or formerly maintained by any of them." *Id.* § 3.11(d).

The agreement defined the "Company" as Metaldyne, *id.* at 4, and "Commonly Controlled Entity" as "the Company or any Company Subsidiary or any other person or entity that, together with the Company or any Company Subsidiary, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or any other applicable Law," *id.* § 3.10(a). These sections of the merger agreement show that defendant was aware of the possibility of controlled group liability for terminated plans under Title IV of ERISA as well as possible liability specifically to PBGC.[7]

This conclusion is further supported by defendant's statements in connection with the stock it sold to finance the Metaldyne acquisition. In the risk factors section of the February 26, 2007 offering memorandum, defendant stated: "Our long-term employee benefit obligations, particularly with respect to Metaldyne, are significantly underfunded and we may have to make cash payments to the plans, reducing the cash available for liquidity." Asahi Tec Corp. Offering Mem., Feb. 26, 2007, Ex. 3 to Landy Decl. ("Asahi Tec Offering Mem.") [Dkt. # 58-3] at 16. It added: "Our projected benefit obligation exceeded the fair value of plan assets by $120.8 million (¥14,246 million) with respect to Metaldyne measured as of October 1, 2005." *Id.* The offering memorandum explained that the terms "our," "us," and "we" referred "to Asahi Tec Corporation and, unless the context indicates otherwise, its consolidated subsidiaries, after giving effect to the acquisition by Asahi Tec Corporation of Metaldyne Corporation and its consolidated subsidiaries." *Id.* at iv. Therefore, the offering memorandum's use of the first person plural to

---

7    The merger agreement's language regarding controlled group entities is repeated in the Stock Purchase Agreement that defendant used to sell its stock in U.S. private placement transactions in relation to the acquisition. *See* Stock Purchase Agreement, Ex. 9(2) to Daniel S. Lubell Decl. [Dkt. # 15-11] §§ 3.10–3.11. The repetition of the language regarding controlled group liability under ERISA in this Agreement supports the conclusion that defendant knew about that type of liability.

describe the risks associated with the underfunded pension liabilities demonstrates that defendant assumed responsibility for these obligations.

Defendant's discussion with one of the underwriters of this stock offering sheds additional light on the offering memorandum's statement about the underfunded pension plans. On January 31, 2007, a representative from Nikko Citigroup – one of the banks copied on the March 2006 email from Okamoto discussing incorporating the underfunded pension plans into the valuation of Metaldyne – told a member of defendant's accounting department:

> Regarding pension liabilities, the English prospectus also states that there is an "UNFUNDED" portion on p. 954 of the 10K, and my understanding is that there is the possibility that your company may have to burden this at some point in the future. From our perspective, we will need to know whether the impact of this has been incorporated into the profit plan.

January 31, 2007 Email, Ex. 9 to Ralph L. Landy Supplemental Decl. ("Landy Supp. Decl.") [Dkt. # 73-11] at 2; *see also* Asahi Tec Offering Mem. at 1 (listing Nikko Citigroup as one of the joint bookrunners and lead managers of the stock offering). So defendant was reminded about the possibility of having to bear the burden of the underfunded Pension Plan less than one month after it closed its acquisition, and it disclosed this risk in its stock offering materials.

In sum, plaintiff has provided additional evidence to demonstrate that defendant knew about the underfunded Pension Plan, that it knew that the Pension Plan was governed by ERISA, that it understood that Asahi Tec could be liable for termination of the plan, and it specifically discussed accounting for that underfunded liability in its valuation of Metaldyne. Nonetheless, defendant maintains that plaintiff "has not identified a single document that so much as mentions controlled group liability or the possibility Asahi Tec could become liable for Metaldyne's unfunded pension liabilities." Def.'s Opp. at 8. But the fact that the term "controlled group liability" is not specifically used in the documents is not dispositive, because defendant used and defined the term "commonly controlled entity" in the merger agreement in reference to the same

section of ERISA that defines "controlled group" for the purposes of underfunded benefit liabilities. Thus, defendant understood controlled group liability and that such liability could arise in relation to a termination of Metaldyne's Pension Plan. More important, whether it used the specific term or not, the documents reflect Asahi Tec's general knowledge and consideration of pension issues in connection with the acquisition.

The three declarations that defendant proffers to support its opposition to plaintiff's motion do not give rise to a genuine issue of material fact as to whether defendant knew about Metaldyne's underfunded pension plans and the possibility of controlled group liability. One declaration is a statement from an expert with no personal knowledge of the matter, who simply draws inferences from the documentary record, and the other two are declarations from officials at Asahi Tec who say, in essence, well, nobody told me about unfunded pension liability. These do not negate the evidentiary record.

The first declaration submitted by the defendant is from Jonathan F. Foster, an expert on mergers and acquisitions with over twenty-five years of experience. Jonathan F. Foster Decl. ("Foster Decl.") [Dkt. # 69-2] ¶ 1. Foster was not involved in the Metaldyne acquisition. But he reviewed Mercer's due diligence on Metaldyne's pension plans and opines that "[t]he degree of underfunding estimated by Mercer was not remarkable" and that "there is no mention in the Mercer Report that the existence of an underfunded pension plan might, under certain circumstances, trigger controlled group liability for [Asahi Tec]." *Id.* ¶¶ 33, 35. This opinion is contradicted by the Mercer Report, which classified the underfunding amount as "significant." *See* Mercer Report at 2. Further, although the Mercer Report did not discuss controlled group liability, the merger agreement specifically mentioned this kind of liability under Title IV of ERISA in relation to terminated pension plans. *See* Merger Agreement §§ 3.10–3.11.

Foster also states that he has reviewed the independent valuation experts' analyses of the negotiated price paid for the acquisition of Metaldyne and "[n]owhere is any adjustment made in the valuation analyses for the underfunded Metaldyne pension plan." Foster Decl. ¶ 37. But the emails between RHJI staff, defendant, Mercer, and other members of the acquisition team demonstrate that the group knew about and specifically discussed accounting for the underfunded pension plans in the valuation of Metaldyne. *See* Feb. 25–27, 2006 Email Chain, Ex. 3 to Pl.'s Reply [Dkt. # 74] at 5; *see also* Mar. 1, 2006 Email, Ex. 2 to Pl.'s Reply [Dkt. # 74]; Feb. 25–27, 2006 Email Chain from Tetsuji Okamoto to Takao Yoshida [Dkt. # 73-9]. So even if defendant ultimately decided not to adjust the Metaldyne acquisition price based upon the pension plan liability, that decision does not alter the fact that it knew about the underfunding and the possibility of controlled group liability. Since defendant decided to acquire Metaldyne with that knowledge, it is reasonable to call it into account in the United States in relation to the underfunded pension liabilities. *See Burger King*, 471 U.S. at 480 (holding that in light of the defendant's voluntary acceptance of the franchise contract, which required payments to be made in Miami, it was presumptively reasonable for the defendant to be called into account in Florida for failing to make those payments).[8] Therefore, the Foster declaration does not present facts to raise a genuine dispute as to whether defendant purposefully directed its activities at the United States.

_____

8        Foster also opines that Asahi Tec's Offering Memorandum statements about "[o]ur long-term employee benefit obligations" and "[o]ur projected benefit obligations" did not signify Asahi Tec's assumption of responsibility for the underfunded pension plan. Asahi Tec Offering Mem. at 16; Foster Decl. ¶ 39. He asserts that the first person plural referred to Metaldyne, a wholly owned subsidiary, and therefore Metaldyne retained this obligation. *Id.* This contention is directly contradicted by the offering memorandum, which defines "we," "us," and "our" as Asahi Tec and its consolidated subsidiaries. Asahi Tec Corp. Offering Mem. at iv.

The second declaration is from Mashiro Urakabe, defendant's banking and finance consultant for the Metaldyne acquisition. Masahiro Urakabe Decl. [Dkt. # 69-5] ¶ 6. Urakabe's "primary role was to negotiate with Japanese banks to obtain their consent for the Metaldyne acquisition and to obtain approval from the Tokyo Stock Exchange ('TSE') for the acquisition." *Id.* In his declaration, Urakabe states that as part of the acquisition process, he attended a number of meetings with Asahi Tec executives and directors to discuss Metaldyne's finances and obligations. *Id.* ¶ 12. According to Urakabe, no one at those meetings ever mentioned the possibility that defendant could become directly liable for Metaldyne's pension liabilities and none of the documents or individuals involved in the transaction mentioned the phrase "controlled group liability." *Id.* ¶ 13.

Urakabe states: "I believe that if anyone at Asahi Tec had known of such potential direct liability, I would have been told about it. This is because I worked closely with Asahi Tec to ensure that its finances and obligations would be separate from Metaldyne's finances and obligations, and because I had a long standing relationship of trust with one of Asahi Tec's lead board members." *Id.* ¶ 14. But Urakabe was not directly involved with defendant's due diligence of Metaldyne or its pension plan. Notably, he never states in his declaration that no one at Asahi Tec knew about controlled group liability; he only states that *he* never heard about it at the meetings he attended, and that he believes that he would have been told about controlled group liability if it had been known by defendant. These are not facts: this is speculation. So Urakabe's suppositions about defendant's knowledge of controlled group liability are insufficient to raise a genuine issue of material fact.

The last declaration is from Hirohisa Yamada, defendant's Senior Management Executive Officer. Hirohisha Yamada Decl. [Dkt. # 69-6] ¶ 1. Yamada states that during the

Metaldyne acquisition process, he worked closely with Takao Yoshida, Asahi Tec's CFO, to collect information about Asahi Tec for Metaldyne's due diligence of Asahi Tec. *Id.* ¶¶ 4, 6. Yamada avers that prior to the close of the acquisition, he was not aware of the possibility that defendant could be directly liable for Metaldyne's underfunded pension liabilities, and that to his knowledge, none of defendant's advisors raised the issue of controlled group liability or discussed it during any of the telephone calls he participated in. *Id.* ¶ 7.

Like Urakabe, Yamada was also not involved in defendant's due diligence or discussions of Metaldyne or its pension plan. For example, Yamada avers that Yoshida never mentioned "controlled group liability" and never discussed Metaldyne's pension plan with him. *Id.* ¶ 8. But the documents proffered by plaintiff demonstrate that Yoshida received an email from an RHJI employee in February of 2006 regarding "adjusting Metaldyne's equity value for any underfunded pension amounts." Feb. 25–27, 2006 Email Chain from Tetsuji Okamoto to Takao Yoshida [Dkt. # 73-9] at 2. While Yamada can attest to his own level of knowledge, this email shows that his declaration cannot create a genuine factual issue concerning the state of mind of others at the company. Therefore, his testimony also fails to raise a genuine issue of material fact on whether the Court has specific jurisdiction over defendant.

In *Burger King*, the Court stated that "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." 471 U.S. at 474 (internal quotation marks and citations omitted). As was explained in more detail in the Court's prior opinion, this standard is met here because the evidence provided by plaintiff demonstrates that defendant purposefully directed activities towards the United States by deliberately and knowingly acquiring a Michigan-based company and subjecting itself to the regulatory scheme including

ERISA liability.  Defendant should therefore have reasonably anticipated litigation arising out of that activity.[9]

C.  Plaintiff's claims arise out of the activities that defendant direct at the United States.

In its opposition memorandum, defendant also reasserts its argument that the Court does not have specific jurisdiction because plaintiff's ERISA claims arise out of the termination of the pension plan and not the activities that defendant directed at the United States – its acquisition and resulting status as a controlled group member of Metaldyne.  Def.'s Opp. at 13–14.  But the Court has already rejected this argument.  *See Asahi Tec*, 839 F. Supp. 2d at 125 (holding that plaintiff's claims arise out of defendant's purposeful activities in the United States because "it was defendant's *status* as a controlled group member, and not the act of termination, that is the driving force behind this lawsuit").  Since defendant has not presented any additional evidence on this point, the Court's previous determination will stand for the reasons set forth in the March 2012 opinion.

D.  The assertion of personal jurisdiction over defendant comports with fair play and substantial justice.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  *Burger King*, 471 U.S. at 476, citing *Int'l Shoe Co.*, 326 U.S. at 320.  But "where a

---

9       Plaintiff argues that defendant's specific knowledge of the Pension Plan, the Pension Plan's underfunding, and the existence of ERISA's statutory and regulatory scheme that governed the Pension Plan is not required for a finding of "purposeful availment" in this case.  Pl.'s Reply at 2–4.  According to plaintiff, specific jurisdiction can be premised on "facts showing that the acquisition was purposeful and knowingly undertaken . . . [such as] the extensive pre-acquisition due diligence, negotiation, regulatory and financing-related activities conducted in the United States over the course of more than a year."  *Id.* at 2.  The Court need not address this argument because it finds that there is no genuine dispute of material fact regarding defendant's knowledge about the Pension Plan's underfunding or ERISA's statutory scheme.

defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. Most of the considerations that a defendant might raise can be addressed through means short of finding jurisdiction unconstitutional. *Id.* (stating that, for example, claims of substantial inconvenience can be addressed by a change of venue). However, jurisdictional rules cannot be used to make litigation "so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." *Id.* at 478 (internal quotation marks and citations omitted).

Defendant argues that the exercise of jurisdiction in this case does not comport with fair play and substantial justice because of the "significant burden and expense it has faced and will face if this action continues." Def.'s Opp. at 28, citing Def.'s Mem. in Supp. of Mot. to Dismiss at 41–42. The analysis under *Burger King* does not focus on whether the litigation is costly to the defendant but whether exercising jurisdiction would put defendant at a "severe disadvantage in comparison to his opponent." *Burger King*, 471 U.S. at 478. Defendant has presented no evidence to meet this standard. Indeed, any argument that defendant is severely disadvantaged when litigating in the United States is undermined by the fact that defendant has previously freely admitted to jurisdiction in another lawsuit in the United States. *See Asahi Tec*, 839 F. Supp. 2d at 129, citing Answer, *HLI Creditors Trust v. Asahi Tec Corp.*, No. 03-56960 (Bankr. D. Del. Jan. 9, 2004); *see also* Merger Agreement § 9.10 (designating the United States as the forum for the resolution of disputes arising out of that agreement).

Moreover, in the two years of litigation in this case, there has been no evidence that defendant has been severely disadvantaged in comparison to plaintiff due to its status as a foreign company. It has submitted numerous briefs and vigorously defended its position. *See*

*also Asahi Tec*, 839 F. Supp. 2d at 129–30 (listing the other factors that support the conclusion that exercising jurisdiction in this case would not offend "traditional notions of fair play and substantial justice").[10]

The Court will grant plaintiff's motion for summary judgment on defendant's lack of personal jurisdiction affirmative defense because plaintiff has demonstrated that defendant purposefully directed activities at the United States when it acquired Metaldyne with knowledge of its underfunded liabilities and the regulatory scheme including ERISA controlled group liability, and plaintiff's claims arise out of those activities. Therefore, the Court has specific jurisdiction over defendant.

## II. Defendant's Liability for Unfunded Benefit Liabilities and Termination Premiums

Plaintiff also seeks summary judgment on defendant's liability for unfunded benefit liabilities and termination premiums by virtue of its status as a member of Metaldyne's controlled group.

A. <u>Defendant is liable for the unfunded benefit liabilities.</u>

29 U.S.C. § 1362(a)–(b) provides in relevant part:

---

10     Defendant's other arguments as to why exercising jurisdiction in this case does not comport with due process are also unpersuasive. First, defendant contends that "[f]orcing Asahi Tec to litigate a claim it never anticipated in a foreign legal system that is exercising jurisdiction on an unprecedented basis is unjust, particularly when Asahi Tec did nothing more than acquire an American company with an underfunded pension plan . . . ." Def.'s Opp. at 27. The Court has already rejected this argument by holding that plaintiff has demonstrated that defendant did more than just acquire an American company with an underfunded pension plan; it acquired that company with knowledge of the underfunding and the potential for liability under ERISA. *See supra* Analysis § I(B). Second, defendant submits that it is not responsible for any harm in the United States because it was not responsible for the termination of the Pension Plan. Def.'s Opp. at 29–30. But as the Court has previously held, "it was defendant's *status* as a controlled group member, and not the act of termination, that is the driving force behind this lawsuit." *See Asahi Tec*, 839 F. Supp. 2d at 125. So, defendant's lack of responsibility for the termination is not relevant for the specific jurisdiction analysis.

> In any case in which a single-employer plan is terminated in a distress termination under section 1341(c) of this title or a termination otherwise instituted by [PBGC] under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section [includes] . . . the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation.

To establish that defendant is responsible for unfunded benefit liabilities under this section, plaintiff must show that: (1) Metaldyne's covered pension plan was terminated under 29 U.S.C. § 1341(c) or 29 U.S.C. § 1342; and (2) defendant was a contributing sponsor of that plan or a member of the contributing sponsor's controlled group on the termination date. *Id.* The first requirement is met here because it is undisputed that Metaldyne's pension plan was terminated under 29 U.S.C. § 1342. *See* Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ 1.

With respect to the second requirement, under ERISA, a "controlled group" consists of companies that are under "common control," including parent corporations and their subsidiaries. *See* 29 U.S.C. § 1301(a)(14)(A)–(B); 26 U.S.C. § 414(b)–(c). A parent-subsidiary controlled group consists of "[o]ne or more chains of corporations connected through stock ownership with a common parent corporation" if the parent organization, directly or through a subsidiary, owns at least an 80% interest in the subsidiary organization. 26 U.S.C. § 1563(a)(1)(A)–(B). Here, Metaldyne is the contributing sponsor of the Pension Plan. Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ G. Further, defendant does not dispute that on the termination date, Metaldyne Holdings LLC – a wholly owned subsidiary of defendant – owned 100% of Metaldyne stock. Answer ¶ 5. So on the date of termination, defendant was a member of Metaldyne's controlled group by virtue of their

indirect parent-subsidiary relationship. Therefore, it is jointly and severally liable for the amount of the unfunded benefit liabilities related to the Pension Plan. *See* 29 U.S.C. § 1362(b)(1)(A).

In its opposition memorandum, defendant does not present any arguments regarding the two requirements for liability under section 1362. Rather, it asserts that "the Court need not decide whether Asahi Tec falls within ERISA's definition of 'controlled group' on the date of Plan termination" because plaintiff has not established that the Pension Plan was underfunded on the termination date and has failed to submit any evidence of the amount of the unfunded benefit liability. Def.'s Opp. at 31 & n.19. Defendant alleges that without this information, the Court cannot enter judgment on liability against defendant on the claim for unfunded benefits. Def.'s Opp. at 31.

Defendant's argument is unsupported by the plain language of 29 U.S.C. § 1362(a) or Federal Rule of Civil Procedure 56. Rule 56 allows a party to move for summary judgment on part of a claim. Fed. R. Civ. P. 56(a). This means that plaintiff may seek summary judgment in relation to defendant's responsibility for the unfunded benefit liabilities regardless of whether there is a genuine dispute of material fact as to the amount of that liability. Further, contrary to defendant's argument, plaintiff has established that the Pension Plan was underfunded on the termination date. Specifically, the termination agreement states that the "Plan will be unable to pay benefits when due." Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ H. Moreover, to incur liability under section 1362, plaintiff need not provide evidence of the amount of the unfunded benefit liability. It simply needs to establish the two elements required section 1362(a). Since plaintiff has met these requirements, and defendant has provided no evidence to the contrary, the Court will grant plaintiff's motion for summary judgment on defendant's liability for the unfunded benefit liabilities referenced in Count I.

B. <u>Defendant is liable for termination premiums.</u>

Plaintiff is effectively an insurer of pension funds. *Pension Benefit Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154, 155 (2d Cir. 2009). One of the ways that plaintiff funds its activities is by collecting premiums on covered plans. Specifically, section 1306 of ERISA authorizes plaintiff to collect annual premiums on ongoing covered plans. 29 U.S.C. § 1306(a)(3)(A)(i). Section 1306 also imposes a termination premium if a covered plan is terminated during bankruptcy or insolvency proceedings or by plaintiff under section 1342.[11] *Id.* § 1306(a)(7)(A). Metaldyne's pension plan was terminated under section 1342, and plaintiff has brought a claim for termination premiums against defendant based on its status as a member of Metaldyne's controlled group.

Defendant argues that it is not liable for termination premiums by virtue of its status as a controlled group member of Metaldyne because section 1306 "unambiguously excludes controlled group members from termination premium liability," and plaintiff's interpretation to the contrary contradicts the plain language of the statute. Def.'s Opp. at 37–44. So this aspect of plaintiff's motion for summary judgment involves a pure question of statutory interpretation.

### 1. Procedure under Chevron

Where a party challenges an agency's interpretation of a statute the agency administers, the Court is required to analyze the agency's interpretation by following the two-step procedure set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*

---

11     Section 1342 authorizes PBGC to terminate a pension plan on its own initiative if certain circumstances are met. 29 U.S.C. § 1342 (a).

at 842–43.  In determining whether Congress has spoken directly to the question at issue, the Court must consider whether "the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill[.]" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005).  Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serono Labs., Inc., v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), including examination of the statute's text, structure, purpose, and legislative history.  *Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

If the Court concludes that the statute is either silent or ambiguous with respect to the issue in question, the second step of the Court's review process is to determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  Once a reviewing court reaches the second step, it must accord "considerable weight" to an executive agency's construction of a statutory scheme it has been "entrusted to administer."  *Id.* at 844.  Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless of whether there may be other reasonable or, even more reasonable, views."  *Serono Labs., Inc.*, 158 F.3d at 1321.  The Supreme Court explained:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron,* 467 U.S. at 843–44. In either event, then, the fundamental inquiry at the first level of the *Chevron* analysis is to ascertain whether Congress has authorized the agency to make rules to fill in a gap.

  *2. Chevron step one does not resolve the controlled group liability question.*

  In determining whether Congress has directly spoken to the issue, the Court must first consider the plain meaning of the statutory text itself. *S. Cal. Edison Co. v. Fed. Energy Regulatory Co.*, 195 F.3d 17, 23 (D.C. Cir. 1999). *Chevron* step one requires the Court to apply traditional canons of statutory interpretation to the law in question to determine if its meaning is clear. *Arqule, Inc. v. Kappos*, 793 F. Supp. 2d 214, 220 (D.D.C. 2011), citing *Eagle Broadcasting Group, Ltd. v. FCC*, 563 F.3d 543, 552 (D.C. Cir. 2009). As the Supreme Court has explained:

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal quotation marks and citation omitted).

  Chapter 18 of Title 29 of the U.S. Code governs the Employment Retirement Income Security Program. The issues in this case arise under subchapter III, Plan Termination Insurance, and specifically, subtitle A, which addresses the pension Benefit Guaranty Corporation, the plaintiff in this action. Within that subtitle, section 1306, entitled "Premium rates" establishes, among other things, the schedules for premium rates and the bases for application of those rates, and section 1307, entitled "Payment of premiums," covers such topics as when the premiums are payable, late payment charges, and PBGC's right to bring a civil

action to collect unpaid premiums. 29 U.S.C. §§ 1306, 1307. Section 1307(a) states that the "designated payor" of each plan shall pay the premiums imposed under subchapter III, and section 1307(e) elaborates upon the term "designated payor." 29 U.S.C. § 1307(a), (e).

Since the termination premiums sought in this case arise under subchapter III of Chapter 18, the starting point of the analysis is section 1307. Section 1307(e), entitled "Designated payor," provides:

> (1) For purposes of this section, the term "designated payor" means--
>
>> (A) the contributing sponsor or plan administrator in the case of a single-employer plan, and
>>
>> (B) the plan administrator in the case of a multiemployer plan.
>
> (2) If the contributing sponsor of any single-employer plan is a member of a controlled group, each member of such group shall be jointly and severally liable for any premiums required to be paid by such contributing sponsor. For purposes of the preceding sentence, the term "controlled group" means any group treated as a single employer under subsection (b), (c), (m), or (o) of section 414 of Title 26.

*Id.* § 1307(e)(1)–(2).[12] Section 1307 also addresses when the payments are due. *See id.* § 1307(a).

Section 1306 establishes premiums rates, and section 1306(a)(7) specifies a premium rate to be paid when plans have been terminated.[13] Subsection 1306(a)(7)(D), entitled,

---

12      Since Metaldyne's pension plan is a single-employer plan, Compl. ¶ 20, the Court will only address ERISA's rules regarding those plans.

13      The "General Rule" for termination premiums is that:

> If there is a termination of a single-employer plan under clause (ii) or (iii) of section 1341(c)(2)(B) of this title or section 1342 of this title, there shall be payable to the corporation, with respect to each applicable 12-month period, a premium at a rate equal to $1,250 multiplied by the number of individuals who were participants in the plan immediately before the termination date.

29 U.S.C. § 1306(a)(7)(A).

"Coordination with section 1307," explains the relationship between the termination premium provisions contained in subsection (a)(7) of section 1306 and the general provisions concerning the payment of premiums generally set out in section 1307.  It says:

> (i) Notwithstanding section 1307 of this title--
>
>> (I) premiums under this paragraph shall be due within 30 days after the beginning of any applicable 12-month period, and
>>
>> (II) the designated payor shall be the person who is the contributing sponsor as of immediately before the termination date.
>
>> (ii) The fifth sentence of section 1307(a) of this title shall not apply in connection with premiums determined under this paragraph.

29 U.S.C. § 1306(a)(7)(D).

The dispute between the parties centers on the words "notwithstanding section 1307 of this title."  According to defendant, if termination premiums arising under section 1306(a)(7) are to be imposed "notwithstanding section 1307," then the provision in section 1307 establishing controlled group liability does not apply to the termination premiums under section 1306.

In support of its position, defendant directs the Court to the definitions section of the statute.  Section 1306 imposes liability for termination premiums on "the contributing sponsor as of immediately before the termination date," 29 U.S.C. § 1306(a)(7)(D)(i)(II), and ERISA defines a "contributing sponsor" as "the employer responsible for making contributions to or under the plan . . . without regard" to the members of the employer's "controlled group."  29 U.S.C. § 1301(a)(13).  During the oral argument, defendant added that since the definition of "contributing sponsor" explicitly excludes controlled group members, whenever ERISA seeks to expand liability to controlled group members, it adds a specific provision to that effect.  *See* 29 U.S.C. § 1307(e)(2) (holding controlled group members jointly and severally liable for premiums); *id.* § 1362(a) (holding controlled group members liable for unfunded pension

liabilities).  Therefore, by failing to expressly call for controlled group liability, section 1306 signals that controlled group members are not designated payors of termination premiums.

But section 1306(a)(7)(A) does not actually say that the termination premiums is to be paid by the "contributing sponsor."  29 U.S.C. § 1306(a)(7)(A).  It simply says that the premium "shall be payable."  This leaves the mechanics to be governed by section 1307, which as has already been noted, controls the payment of all premiums under the subchapter.

Section 1306(a)(7) though, goes on to address how the two provisions will work together in subsection (D), "Coordination with section 1307."  It provides that "notwithstanding section 1307 . . . the designated payor shall be the person who is the contributing sponsor as of immediately before the termination date."  29 U.S.C. § 1306(a)(7)(D)(i)(II).  Defendant contends that "contributing sponsor" must be defined in accordance with the definitions section of the statute to exclude controlled group members, and that the only conflict between the definitions of "designated payor" in sections 1306 and 1307 that could warrant the use of the word "notwithstanding" is section 1307's extension of liability beyond contributing sponsors to their controlled group members.  Def.'s Opp. at 38.  Therefore, according to defendant, by using the word "notwithstanding," Congress signaled its clear intent to exclude controlled group members from liability for termination premiums.  *Id.*

Plaintiff, the agency responsible for the implementation of ERISA, interprets the "notwithstanding" clause differently.  It reads section 1306 as displacing only the definition of "designated payor" contained in section 1307(e)(1)(A), not all of section 1307(e).  It contends that by titling the section "coordination with section 1307", Congress signaled its understanding that everything in section 1307 – which governs all premiums under the subchapter generally – would apply to the termination premiums unless an explicit exception or differentiation was set

out below.  It argues that Congress was quite specific and clear when it wanted to carve out a specific provision of section 1307, and it points to section 1306(a)(7)(D)(ii), which states that "[t]he fifth section of section [1307(a)] shall not apply in connection with premiums determined under this paragraph."  Pl.'s Reply at 24.  According to plaintiff, since section 1306 did not specifically eliminate section 1307's imposition of joint and several liability on members of a contributing sponsor's controlled group, the provision continues to apply in the context of termination premiums as with other premiums.

Plaintiff has promulgated the following rule based on its interpretation of the statute:

> Liability for termination premiums. In the case of a DRA 2005 termination of a plan, each person that was a contributing sponsor of the plan on the day before the plan's termination date, or that was on that day a member of any controlled group of which any such contributing sponsor was a member, is jointly and severally liable for termination premiums with respect to the plan.

29 C.F.R. § 4007.13(g).

Defendant argues that the Court should reject this regulation at step one of the *Chevron* analysis because the regulation "contradicts the plain language of the statute."  Def.'s Opp. at 40. The Court concludes that although defendant's interpretation of the two provisions is reasonable, it is not compelled by the statute because the text is ambiguous.

Section 1306(a)(7)(D), "Coordination with section 1307," contains two parts: subsections (i) and (ii).  The first subsection sets out the rules regarding when termination premiums are due and who is liable for their payment, and it begins by noting that the provisions that follow will apply "[n]otwithstanding section 1307."  29 U.S.C. § 1306(a)(7)(D)(i). Notwithstanding means despite or in spite of.  Black's Law Dictionary 1168 (Deluxe 9th ed. 2009).  So the question to be decided is:  which portions of section 1307 was section 1306(a)(7)(D) meant to displace?

Section 1307(e), "Designated payor," has two sections: (1) and (2). Subsection (1)(A) defines the term "designated payor" for the purposes of a single-employer plan, and it specifies that the designated payor may be "the contributing sponsor **or plan administrator**." 29 U.S.C. § 1307(e)(1)(A) (emphasis added).[14] Subsection (2) then provides that "[i]f the contributing sponsor of any single-employer plan is a member of a controlled group, each member of such group shall be jointly and severally liable for any premiums required to be paid by such contributing sponsor." *Id.* § 1307(e)(2). In other words, subsection (e)(2) of section 1307 adds a gloss to the use of the term "contributing sponsor" in the definition of the "designated payor" in the case of a single-employer plan to address the situation when the "contributing sponsor" is a member of a controlled group.

Section 1306, however, states that in the case of termination premiums, "the designated payor shall be the person who is the contributing sponsor as of immediately before the termination date." 29 U.S.C. § 1306(a)(7)(D)(i)(II). Thus, the direct conflict between the definitions of designated payor in the two sections is that section 1307 imposes liability on plan administrators while section 1306 does not. So, by using the phrase "notwithstanding section 1307" Congress clearly signaled its intent to exclude plan administrators from liability for termination premiums.

It is unclear, however, whether the phrase "notwithstanding" also displaces section 1307(e)(2)'s extension of contributing sponsor liability to controlled group members. Section 1307(e) and 1306(a)(7)(D)(i)(II) both use the term "contributing sponsor" in the same manner, and the provision expanding on the concept in section 1307(e)(2) does not appear to directly contradict or conflict with the use of the term in 1306. It simply explains that if the contributing

---

14      Subsection (1)(B), which is not relevant here, defines "designated payor" in the case of a multiemployer plan to be the plan administrator only.

sponsor is a member of a controlled group, then the controlled group members are jointly and severally liable for any premiums that the contributing sponsor is required to pay. Rather than define designated payor in a way that section 1306 would need to differentiate, it simply explains the scope of the liability associated with a contributing sponsor. Since it is unclear whether the phrase "[n]otwithstanding section 1307" only applies to section 1307(e)'s definition of "designated payor" or whether it also applies to its explanation regarding the extension of liability from the contributing sponsor to its controlled group members, the validity of 29 C.F.R. § 4007.13(g) cannot be resolved at step one of the *Chevron* analysis, and the Court must move on to step two.

      *3. Under Chevron step two, the Court finds PBGC's interpretation to be reasonable.*

      At *Chevron* step two, the Court must accord deference to the agency's interpretation of the statute, *see, e.g., Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 72 (D.D.C. 2006), and it is difficult to conclude that plaintiff's interpretation of the statute to impose liability for termination premiums on controlled group members is not based on a permissible reading of the statute, *see Chevron*, 467 U.S. at 843. First of all, there is some support for the agency's position in the text. The designated payor provision in section 1307(e) is divided into two parts. Part (1) states "*for purposes of this section*," the term "designated payor means . . . the contributing sponsor or plan administrator." 29 U.S.C. § 1307(e)(1)(A) (emphasis added). So that definition is limited to premiums paid under section 1307. But part (2), which imposes controlled group liability, is not so limited, and could therefore reasonably be construed as applying to all premiums paid under the subchapter. *See id.* § 1307(e)(2). Section, plaintiff's interpretation is consistent with the structure and purpose of the statute as a whole.

Defendant argues that the legislative history undercuts plaintiff's interpretation of the statute. It contends that the purpose of the termination premium is "to deter a plan sponsor from shedding its employment plan obligations through bankruptcy and burdening PBGC with the cost of those obligations, only to resume operations later." Def.'s Opp. at 39, citing H.R. Rep. No. 109-232, pt. 2, at 114 (2005), 2005 WL 3343873 ("employers that terminate their plans on an underfunded basis (other than in bankruptcy liquidation proceedings) should continue to bear some financial responsibility for pension benefits following reorganization"). It adds that "a controlled group member, in contrast, does not need to be deterred from orchestrating a strategic bankruptcy such as this within its corporate family, as it could bear responsibility for the entire unfunded pension obligation in any event." *Id.* Therefore, according to defendant, imposing liability for termination premiums on controlled group members serves no deterrent purpose. *Id.*

But Congress' intent was broader than that. It was concerned with the "unprecedented and systematic pension underfunding problem within the defined benefit pension system," and it sought to "require[] plans to pay a termination premium to the PBGC for assuming the liabilities of underfunded pension plans which are terminated under distress termination procedures." H.R. Rep. 109-276, at 346 (2005), 2005 WL 3131518. This new premium was meant to "help to improve the financial status of the PBGC, which in turn [would] ultimately better protect workers and retirees receiving PBGC-guaranteed benefits now and into the future." H.R. Rep. 109-276, at 336. This broader intent is manifested in the language of section 1306(a)(7)(A), which does not limit liability for termination premiums to companies that seek to use bankruptcy to discharge their pension liabilities only to reemerge, but also to plans that are terminated by the PBGC under section 1342.

There is nothing about this broader intent that limits the liability for termination premiums to plan sponsors at the exclusion of their controlled group members. Rather, imposing termination premiums on controlled group members would increase the chance that the premium would actually be paid, and fulfill Congress' intent to provide additional resources to PBGC. Moreover, as plaintiff has noted, imposing controlled group liability for termination premiums fulfills Congress' intent of deterring companies from "orchestrating a strategic bankruptcy" and burdening PBGC with the cost of their pension obligations because it encourages the controlled group members to assume the pension liability during a bankruptcy instead of terminating the plan in order to escape the additional penalty of a termination premium. *See* Letter from PBGC to Asahi Tec Corp., Ex. 1 to Landy Decl. [Dkt. # 58-3] at 1.15

Moreover, interpreting section 1306 as retaining controlled group liability for termination premiums is reasonable within the structure of Title IV of ERISA, which regulates plan termination insurance. *See* 29 U.S.C. §§ 1301–1461. Controlled group members have broad liability throughout Title IV: they are liable for annual premiums under section 1307(e) and for unfunded benefit liabilities under section 1362(a). The purpose of controlled group liability is to prevent companies from escaping liability for their pension liabilities by putting the pension plans in shell corporations; it ensures that plaintiff will be able to collect premiums from some entity when the plan sponsor is unable to pay. Since section 1306 does not explicitly displace

---

15    Defendant also notes that the legislative history states that "employers" and "plan sponsors" will be liable for termination premiums and that Congress never explicitly stated its intent to expand that liability to controlled group members. *See* Def.'s Opp. at 39. The use of these words in the legislative history is not dispositive because the legislative history also refers to "plan sponsors" when discussing liability for the annual premiums, *see* H.R. Rep. 109-232, pt. 2, at 86 (2005), and section 1307(e) provides that controlled group members are also liable for annual premium.

section 1307's imposition of controlled group liability for premiums payable to PBGC, it is reasonable for plaintiff to interpret the statute in a manner consistent with this central concept.

In sum, both parties have made reasonable and compelling arguments regarding the proper interpretation of section 1306(a)(7)(D) and whether controlled group members are liable for termination premiums. They have pointed to various sections of ERISA and the legislative history that support their positions. The Court has wrestled with the question and has been unable to distill a clear answer from the text of the statute. Under those circumstances, the law requires the Court to defer to the agency's interpretation. Defendant argues that the Court should not defer to plaintiff's interpretation of the statute because "determining what Congress meant in this case is a matter of pure statutory interpretation, uninformed by any specialized knowledge regarding pension plans. . . ." Def.'s Opp. at 42–43, citing *AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 765 (D.C. Cir. 2012).

The Court begs to differ, and apparently it is not alone in finding this statute to be difficult to understand. Even the Supreme Court has stated "[w]e have traditionally deferred to the PBGC when interpreting ERISA, for 'to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass.'" *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007), quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 722 (1989). As the discussion above indicates, determining Congress' intent involves analyzing the structure of ERISA and how to fulfill Congress' goal to ensure that the PBGC "is on sound financial footing." *See* H.R. Rep. 109-276, at 61. These issues fall squarely within plaintiff's expertise, and since the statute is ambiguous, the Court must defer to plaintiff's interpretation if it is reasonable. *See Allied Local and Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 71 (D.C. Cir. 2000) ("Under *Chevron*, we are bound to uphold agency interpretations as long as

they are reasonable – regardless whether there may be other reasonable, or even more reasonable, views.") (internal quotation marks and citation omitted).

Thus, under *Chevron* step two, the Court finds that it was permissible for the agency to construe the term of designated payor under 29 U.S.C. § 1306(a)(7)(D)(i)(II) to include section 1307(e)(2)'s imposition of the joint and several liability onto controlled group members, and it will uphold the regulation. Under this interpretation, defendant is liable for termination premiums under section 1306 because Metaldyne was the contributing sponsor as of immediately before the termination date, and defendant was a member of Metaldyne's controlled group. *See* Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ C; *see also supra* Analysis § II(A).

C. Plaintiff's claim for termination premiums is ripe.

Defendant also argues that plaintiff's claim for the termination premium is premature. Def.'s Opp. at 32–37. The "General Rule" for termination premiums is that:

> If there is a termination of a single-employer plan under clause (ii) or (iii) of section 1341(c)(2)(B) of this title or section 1342 of this title, there shall be payable to the corporation, with respect to each applicable 12-month period, a premium at a rate equal to $1,250 multiplied by the number of individuals who were participants in the plan immediately before the termination date.

29 U.S.C. § 1306(a)(7)(A). ERISA also has a "special rule" for plans terminated in bankruptcy reorganization:

> In the case of a single-employer plan terminated under section 1341(c)(2)(B)(ii) of this title or under section 1342 of this title during pendency of any bankruptcy reorganization proceeding under chapter 11 of Title 11 . . . [the general rule on termination premiums] shall not apply to such plan until the date of the discharge or dismissal of such person in such case.

29 U.S.C. § 1306(a)(7)(B).

Defendant asserts that the special rule applies in this case because the Pension Plan was terminated during the pendency of Metaldyne's chapter 11 reorganization proceeding, and that under the special rule, plaintiff's claim for termination premiums has not yet arisen because Metaldyne has not been discharged or dismissed from that proceeding. Def.'s Opp. at 34, citing *PBGC v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) (holding that under the special rule, "an employer's obligation to pay a Termination Premium on a pension plan that is terminated during the course of the bankruptcy does not even arise until the bankruptcy itself is terminated").

Plaintiff agrees that under the special rule, a reorganizing debtor's liability for termination premiums would not arise until the date of discharge or dismissal from the bankruptcy case. Pl.'s Reply at 19; *see also* 29 C.F.R. § 4007.13(e)(3)(ii). It explains that the special rule applied in *Oneida* because the plan was terminated while the employer was seeking *reorganization* in bankruptcy, which it ultimately achieved. Pl.'s Reply at 18 n.41. However, plaintiff argues that the special rule does not apply if the pension plan terminates when the employer is attempting to *liquidate* under chapter 11, which is what plaintiff alleges occurred in this case. Pl.'s Reply at 19–20.

*1. Chevron step one*

The special rule applies when the plan is terminated by PBGC "during pendency of any bankruptcy reorganization proceeding under chapter 11." 29 U.S.C. § 1306(a)(7)(B). Defendant contends that the special rule applies since PBGC terminated the plan under section 1342 while Metaldyne's Chapter 11 bankruptcy proceeding was pending. Plaintiff does not dispute the timing, but it maintains that since it was not technically a Chapter 11 "reorganization" proceeding, the general rule that termination premiums are payable applies without any

modification by the special rule. Thus, plaintiff puts the emphasis on the term "reorganization" in section 1306(a)(7)(B), while plaintiff underscores the word "any."

Chapter 11 can involve both reorganization and liquidations; chapter 11 "reorganizations include total liquidations pursuant to a confirmed plan." *See* Def.'s Opp. at 36, citing *In re Deer Park*, *Inc.*, 10 F.3d 1478, 1481 (9th Cir. 1993) (alteration in original) ("Chapter 11 of the Bankruptcy Code provides that liquidation may be a form of reorganization, as opposed to a straight liquidation under Chapter 7."); *see also* 11 U.S.C. § 1129(a)(11) (stating that a court can confirm a plan under chapter 11 that includes a proposed liquidation). Therefore according to defendant, since the special rule applies to "*any* bankruptcy reorganization proceeding under chapter 11," it must include those that involve total liquidation. And since the Pension Plan was terminated by PBGC after Metaldyne filed for bankruptcy reorganization under chapter 11, the special rule applies, and the termination premium claim would not be ripe until Metaldyne was discharged or dismissed.

For its part, plaintiff notes that the statute does not state that the special rule applies to plans that are terminated during pendency of any bankruptcy proceeding under chapter 11. It is specifically limited to those terminated during "any bankruptcy *reorganization* proceeding." According to defendant, the use of the qualifier "reorganization" indicates that other types of bankruptcy proceedings under chapter 11 – such as liquidations – are excluded from the purview

of the special rule.[16]   Otherwise, according to plaintiff, the word would add no meaning to the sentence at all.

The Court finds that the need to give each word in the provision some meaning is an important consideration.  It also finds it helpful to look at the remaining language of the special rule, which states that termination premiums shall not apply to plans that are terminated during the pendency of any bankruptcy reorganization proceeding "until the date of the discharge or dismissal" of the debtor from the bankruptcy case.  29 U.S.C. § 1306(7)(B).  As defendant itself points out, under chapter 11, a corporate debtor who liquidates all or substantially all of its assets does not obtain a discharge.  *See* Def.'s Opp. at 35; *see also* 11 U.S.C. § 1141(d)(3)(A) ("The confirmation of a plan does not discharge a debtor if-- the plan provides for the liquidation of all or substantially all of the property of the estate.").  Similarly, a liquidating debtor's bankruptcy case will not be dismissed; it will be closed.  *See* 11 U.S.C. § 1112(b)(1) (stating that chapter 11 cases are dismissed only "for cause").  Therefore, interpreting the special rule to apply to liquidating debtors would allow those debtors to evade the termination premiums because they will never have a "date of discharge or dismissal," and obligation would never attach.

Defendant is not troubled by this circumstance.  It argues that this outcome is consistent with Congress' intent, which was to deter strategic bankruptcies[17] by imposing termination

---

16     Plaintiff also argues that the term "reorganization" is used differently in ERISA than in the bankruptcy code.  It notes that section 1341 differentiates between liquidation and reorganization in bankruptcy.  *Compare* 29 U.S.C. § 1341(c)(2)(B)(i), *with* 29 U.S.C. § 1341(c)(2)(B)(ii).  For example, section 1341(c)(2)(B)(ii)(IV), which deals with bankruptcy reorganizations specifically discusses allowing a company "to continue in business outside the chapter 11 reorganization process," but section 1341(c)(2)(B)(i), which discusses liquidation does not envision any emergence from bankruptcy.  Therefore, plaintiff contends that ERISA's use of the word "reorganization" is limited to companies who expect to emerge from bankruptcy.

premiums only on plan sponsors that emerge from bankruptcy reorganization and not on those

who never emerge because they are liquidated. *See* Def.'s Opp. at 39, citing *Oneida Ltd. v.*

*Pension Benefit Guar. Corp.* (*In re Oneida Ltd.*), 383 B.R. 29, 38 n.8 (Bankr. S.D.N.Y. 2008)

(noting that the 2006 ERISA amendment creating termination premiums "does not appear to

have any application at all" when "a corporate debtor liquidates in Chapter 11")[18] and 29 U.S.C.

§ 1306(a)(7)(A) (imposing termination premiums on plans terminated during reorganization

proceedings under 29 U.S.C. § 1341(c)(2)(B)(ii) but not on plans terminated during liquidation

proceedings under 29 U.S.C. § 1341(c)(2)(B)(i)). Defendant contends that under the special rule,

a company that reorganizes under chapter 11 will be liable for termination premiums when it

emerges from bankruptcy but it will not be liable if it liquidates. Def.'s Opp. at 39.

The Court disagrees. There is nothing about section 1306(a)(7)(B) that indicates that the

special rule was meant to be an exception to the liability for termination premiums imposed in

section 1306(a)(7)(A) for a category of debtors. The text reveals that the special rule is meant to

be a timing provision only.

The general rule establishes that termination premium liability arises: "[i]f there is a

termination of a single-employer plan under clause (ii) or (iii) of section 1341(c)(2)(B) of this

title or section 1342 of this title, there *shall be payable* to the corporation, . . . a premium . . . ."

29 U.S.C. § 1306(a)(7)(A) (emphasis added). Contrary to defendant's assertion, this rule does

not limit liability for termination premiums solely to companies who "orchestrate strategic

---

17      Defendant defines strategic bankruptcies as when a company discharges its pension plan
obligations in bankruptcy, only to resume operations after emerging from bankruptcy. Def.'s
Opp. at 39.

18      The *Oneida* bankruptcy court's statement in a footnote that termination premiums may
not apply to plans that are terminated during chapter 11 liquidations is dicta that is not binding
on this Court.

bankruptcies." It imposes liability on companies whose plans are terminated by plaintiff under section 1342 regardless of whether they are liquidating or reorganizing. Here, plaintiff's termination of Metaldyne's pension plan under section 1342 triggered its liability for termination premiums. *See* Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ 1.

The special rule is simply a timing provision. It states: "[i]n the case of a single-employer plan terminated . . . under section 1342 of this title during pendency of any bankruptcy reorganization proceeding under chapter 11 of Title 11 . . . [the general rule on termination premiums] shall not apply to such plan *until* the date of the discharge or dismissal of such person in such case." *Id.* § 1306(a)(7)(B) (emphasis added). The statute does not state that section 1307(a)(7)(A) liability for termination premiums shall not apply "unless or until" the date of discharge or dismissal. So, the use of the word "until" indicates that this rule is meant to regulate *when* the termination premium liability will arise, not *if* the liability arises at all. It does not eliminate the debt; it simply delays it in certain circumstances. Further, the phrase "until the date" signals that under the special rule the liability will arise on a particular date, and interpreting the special rule to apply to debtors who liquidate under chapter 11 and for whom the date will never come fails to give meaning to the phrase "until the date of discharge or dismissal." Therefore, the text of the statute favors plaintiff at *Chevron* step one.

    *2. Chevron step two*

Insofar as there is any ambiguity in the statutory language of the special rule, plaintiff's interpretation is reasonable in light of the legislative history. Congress established termination premiums in response to increasing financial pressure on the PBGC as a result of "an unprecedented wave of pension plan terminations with substantial levels of underfunding." *See*

H.R. Rep. 109-276, at 345–48; *see also Oneida*, 562 F.3d at 157. Congress explained that "[t]he bankruptcy courts should not be used as a mechanism for eliminating the burden of an underfunded pension plan. . . ." H.R. Rep. 109-276 at 348. However, Congress also understood that if the termination premium obligation is not deferred while a company is in bankruptcy reorganization proceedings, then the obligation would be discharged as part of the reorganization under 11 U.S.C. § 1141(d)(1)(A) along with other claims against the debtor. *See Oneida*, 562 F.3d at 156–58.

To prevent corporations from discharging these premiums in bankruptcy, Congress created the special rule, which applies when "a plan is terminated under bankruptcy *reorganization* or a petition seeking *reorganization* under bankruptcy." H.R. Rep. 109-276, at 348–49 (emphasis added). This legislative history demonstrates that the special rule is intended to ensure that reorganizing debtors will pay the termination premium after they emerge from bankruptcy. But since liquidating debtors will not emerge from bankruptcy, the special rule was not designed to apply to them; rather they must pay the termination premium under the schedule imposed by the general rule.[19] Therefore, insofar as the state is ambiguous, the Court will defer to plaintiff's interpretation of the special rule under *Chevron* step two because the legislative history indicates that its interpretation is reasonable.

---

[19]    Defendant asserts that the Court should not defer to plaintiff's interpretation of the special rule because that interpretation has been inconsistent with plaintiff's position in other cases and throughout this case. Def.'s Opp. at 33. But plaintiff has consistently interpreted the special rule as applying only to debtors who reorganize under chapter 11. *See* 29 C.F.R. § 4007.13(e)(3)(ii) (stating that the special rule applies to debtors with proceedings "pending as a reorganization under chapter 11"); Ex. 6 to Theresa S. Gee Decl., PBGC Memo. in Support of Mot. for Summary Judgment in *In re Oneida*, Nos. 06-1920, 06-10489 (Bankr. S.D.N.Y. 2007) [Dkt. # 70-7] at 18 (asserting that under the special rule termination premiums apply to "reorganizing debtors only as a post-bankruptcy obligation after emergence from bankruptcy"). Moreover, plaintiff has consistently maintained throughout this case that defendant is liable for termination premiums. And its failure to specify its exact theory of liability does not make its position inconsistent.

On June 16, 2009, three weeks after filing its chapter 11 case, Metaldyne filed a motion for court approval to sell substantially all of its assets. Pl.'s Reply at 20, citing *Metaldyne*, Docket No. 214 (Bankr. S.D.N.Y., June 16, 2009). In the order granting this motion, the Court noted: "At the time the [Metaldyne] Debtors filed their chapter 11 petitions in May 2009, they contemplated that there would be several public auctions to sell their four principal business units. . . ." *See In re Metaldyne Corp.*, 409 B.R. 671, 673 (Bankr. S.D.N.Y. 2009). In fact, one of the auctions was originally scheduled as early as July 24, 2009. *Id.* at 673 n.3. The Pension Plan was terminated on July 31, 2009, more than a month after Metaldyne filed its motion to sell its assets. Agreement for Appointment of Trustee and Termination of Plan [Dkt. # 11-7] ¶ 2. Therefore, at the time of the termination, Metaldyne was liquidating under chapter 11, not reorganizing.

At oral argument, defendant stated that the Metaldyne bankruptcy was not a liquidation but a reorganization and a sale of the business to another entity. But this argument is undermined by defendant's acknowledgement in its opposition memorandum that Metaldyne was not attempting to reorganize but to liquidate under chapter 11. Def.'s Opp. at 35 ("Metaldyne's confirmed plan provides just that, as all its assets are to be sold and its 'business operations withdrawn for all purposes.'"). Since Metaldyne will not continue its business operations after bankruptcy, the special rule does not apply, and plaintiff's claim for termination premiums is ripe under the general rule. *See* 29 U.S.C. § 1306(7)(A).

## CONCLUSION

For the reasons stated above, the Court will grant plaintiff's motion for summary judgment on (1) defendant's affirmative defense of lack of personal jurisdiction; and (2)

defendant's liability for unfunded benefit liabilities under 29 U.S.C. § 1362 and for termination premiums under 29 U.S.C. §§ 1306(a)(7)(A) and 1307(e)(2).  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: October 4, 2013